**Patrick Gregory MURPHY, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–77–111.**

Court of Criminal Appeals of Oklahoma.

May 31, 1977.

James W. Fransein, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Duane N. Rasmussen, Legal Intern, for appellee.

OPINION

BLISS, Judge:

Appellant, Patrick Gregory Murphy, hereinafter referred to as defendant, was convicted of the crime of Embezzlement By Employee, pursuant to 21 O.S.1971, § 1456, upon trial by jury in the District Court, Tulsa County, Case No. CRF–77–2774, and sentenced to a term of six (6) months in the custody of the Department of Corrections. From said judgment and sentence the defendant brings this timely appeal.

The evidence presented by the State consisted of the testimony of Ronald D. Marsh, a security manager for Sears, Roebuck and Company; Ferrell Kirtley, a former employee of Sears, Roebuck and Company and co-defendant; and, Roy Hunt, a Tulsa police officer; along with items of evidence described as a dishwasher, a clothes washer, a clothes dryer, and a compactor, which were recovered from the defendant.

Ronald D. Marsh, the State's first witness, testified that on November 20, 1974, he was watching the Sears, Roebuck and Company warehouse which was located at 12th and Fulton Streets in Tulsa. He stated that the warehouse was, among other things, a sales outlet for damaged and repossessed merchandise to the public at reduced prices. He declared that he had previously determined that the warehouse was losing merchandise, and his investigation led him to believe that Ferrell Kirtley, a salesman employed in the warehouse, was involved and that Wednesday was the day of the week on which Kirtley would be most able to cover any unusual or illicit activity. On Tuesday, November 19, 1974, Marsh re-

counted that he and an assistant recorded the serial numbers of all the appliances in the warehouse. He related that the next morning he parked a pickup truck with a camper in a position to enable him to watch the two entrances to the building. Marsh observed the defendant drive up to the warehouse in a pickup truck, speak with Kirtley for a few moments, go inside the warehouse, come back out, back the pickup to the loading dock and arrange the appliances which Kirtley loaded into the truck. He asserted that he never saw any paper work change hands from the time the defendant drove up until the time he left. Marsh then notified Detective Gatlin of the Tulsa Police Department of what he had observed. Marsh admitted that he also communicated the defendant's name and address to Gatlin, this information having come from Marsh's wife who worked with the defendant and for whom the defendant had offered to obtain a refrigerator at an undetermined price. He apprised the court that he was able to identify the appliances recovered from the defendant because the serial numbers matched those he had taken on November 19, 1974. Marsh further asserted that upon examination of the tickets for the day's sales he did not find any papers which related to transactions for any of the four items possessed by the defendant.

During the testimony of Marsh, the State attempted to elicit testimony that one Pete Nicklau and Wayne Padgett were observed making similar transactions, but this testimony was allowed only to the extent that an unnamed person made transactions similar in appearance with that of the defendant before the defendant appeared at the warehouse. The prosecutor did not pursue this evidence or further develop it until closing argument.

The next witness for the State, Ferrell Kirtley, stated that he had known the defendant for about a year and a half, that he and the defendant frequently played cards together, that he discovered the defendant was in need of some appliances for a home he had purchased, and that subsequently he discussed a sale with the defendant. Kirt-

ley testified that there were several conversations about the sale, but that they were not able to come to an agreement to do business until he offered the defendant "a better price than what Sears would offer him." Kirtley said that the defendant knew the exchange would be dishonest because when told of the nature of the transaction the defendant replied, "there's a little larceny in all poker players, isn't there?" Kirtley testified that the defendant came to the warehouse shortly after noon on November 20, 1974, came into the warehouse, picked out the merchandise, agreed on a price, paid $400.00 by check to Kirtley (but did not fill in the space for the payee), and that he did not give the defendant a receipt although he did assure the defendant that all the warranty records were taken care of and that the warranties would be good. Kirtley admitted that he tore up the defendant's check and that he was charged with other crimes arising out of the embezzlement of up to $20,000.00 worth of merchandise. Kirtley asserted that this was the only transaction ever completed between the defendant and himself.

The last witness for the State's case in chief was Roy Hunt, police officer for the City of Tulsa. Officer Hunt related that on November 20, 1974, he was ordered to the defendant's home. Upon arrival he saw the defendant unloading a dryer from a pickup truck, and advised the defendant that he was under arrest because the articles which he was unloading had been reported stolen. Hunt stated that the defendant was cooperative, invited him into his house, and showed him the rest of the merchandise and a notation in his checkbook which said "Ferrell, $400." The officer testified that he then transported the defendant to the police station along with the merchandise.

The State then rested, and the defendant demurred to the State's evidence as being insufficient to sustain a verdict. The demurrer was overruled.

The defendant called six character witnesses who all testified that he was of good character. He also called his father, Jorel

E. Murphy, who testified, inter alia, that Kirtley had at one time prior to trial assured him that his son was innocent, but that Kirtley changed his testimony at the preliminary hearing. He said that his son had invited him to go with him but that he could not because it was during a busy period at work.

Testifying on his own behalf, the defendant described the nature of his employment and his employment record. He stated that in his position with Professional Apartment Finders he had the use of master keys to various occupied, unoccupied, furnished and unfurnished apartments. The defendant testified that he frequently dealt with outlets such as the warehouse in question in order to furnish appliances and furniture for some of the rental property which he managed. The defendant related that he first met Kirtley during a series of poker games, and that when they discussed each other's employment they discussed the possibility of the defendant purchasing merchandise from the Sears warehouse. The defendant said he went to the warehouse on one other occasion, but did not purchase anything. He admitted going to the warehouse on November 20, 1974, and agreeing to purchase the four items previously admitted into evidence for $400.00. He stated that since the goods were damaged or repossessed he did not think it unusual for the salesman to offer him a deal. The defendant testified that he at no time felt anything unusual was going on or that he was dealing with Kirtley personally. His testimony established that he backed his pickup up into the dock area and Kirtley loaded the goods. The defendant claimed that after the merchandise was loaded, he asked Kirtley whether he should make the check out to Sears; Sears, Roebuck, and Company; or, to Sears warehouse. According to defendant, Kirtley responded that he should leave the check blank and he would stamp it. The defendant testified that this procedure was not dissimilar to his dealings with another such warehouse outlet known as Insurance Outlet. The defendant admitted that he received no receipt but said that he thought his check would be sufficient and

that he did not wish to wait for a receipt because he was late for a business appointment. The defendant further testified that he frequently left the space for the payee blank on personal checks he drafted, and produced several such checks as examples. He asserted that Kirtley had led him to believe he was dealing with Sears and that as a salesman in the warehouse Kirtley could discount items within a given range.

The defendant then renewed all prior motions and demurred to the State's evidence. The motions were denied.

The defendant brings four assignments of error on appeal. We need only consider the first assignment in the defendant's brief.

The defendant's first assignment of error is that the court erred in allowing the prosecutor to argue as a basis for guilt the defendant's purported association with known criminals.

The defendant draws this Court's attention to two examples of prejudicial argument from the prosecutor's closing argument:

". . . And here this man, they were friends, card-playing friends, there's no animosity between the two except what, after November 20th when the birds who flock together suddenly scattered because old alliances are off and new alliances are formed and I am surprised about that, that's the thing I have learned, some new alliances that have been formed, the alliance that exists then and have existed and exist now between Pete Nicklau, Padgett and Patrick Gregory Murphy. Strange how these things come about. Strange. Whose the developer at Sundowner Apartments? Wayne Padgett.

\* \* \* \* \* \*

"I remember, because I was involved in it, the events of November 20th and at the particular time Mr. Fallis and myself and other officers that you have heard, Jim Aud, Carroll Gatlin, were after bigger fish and a little fish, so far as we were concerned at that time, got caught in the web that particular day and that was Mr. Murphy."

It must be noted that the defendant objected to the first comment and the trial judge sustained the objection, and admonished the jury to disregard the remark. The defendant also objected to the second above quoted and subsequent comment, and moved for a mistrial, but it was denied. We must also consider the State's faulty and abandoned attempt to establish a basis for this argument. Reading the case as a whole, the above quoted excerpts do not seem to have been made in good faith.

In view of the closeness of the evidence in this case, we cannot say that these comments did not influence the verdict.

This Court in *Seely v. State,* Okl.Cr., 471 P.2d 931 (1970), said:

". . . In these situations, it becomes necessary for the Court to look at the record and consider all of the pertinent facts and circumstances reflected therein, to determine whether or not the attorneys' conduct and argument had a prejudicial effect on the jury. Upon such consideration, if it appears that the verdict may have resulted from such prejudicial effect, this Court is empowered to take such corrective action as the matter warrants. . . ." (Citation omitted)

In the instant case the prosecutor compounded the problem by referring to some association by guilt after the trial judge had sustained an objection when he made the second comment above quoted, and when he purportedly tried to explain his reference later, as follows:

". . . I am not trying to convict Mr. Murphy because he has what, been friendly, formed an alliance, sought the help of, or whatever, Wayne Padgett. I just say it's kind of funny, . . ."

Once the jury had been admonished to disregard such argument, there was no reason for the prosecutor to refer to it again other than for its prejudicial value.

From an examination of the record as a whole, we find that the prosecutor chose to discuss issues not in the case and prejudicial to the defendant, that the evidence is close, and that the defendant objected to the first two remarks in question. In line with this Court's holding in *Harvell v. State,* Okl.Cr., 395 P.2d 331, 339 (1964), we *REVERSE* and *REMAND* for a new trial.

BUSSEY, P. J., specially concurs.

BRETT, J., concurs.

BUSSEY, Presiding Judge, specially concurs.

While I am in accord with the conclusion that this case must be reversed because of the prejudicial remarks of the prosecutor, viewing the evidence from the light most favorable to the State, I am of the opinion that the evidence is wholly insufficient to support the charge of Embezzlement By an Employee, and for that reason not only would I reverse, I would remand with instructions to dismiss.